AEA Middle Mkt. Debt Funding LLC v Marblegate Asset Mgt., LLC (2023 NY Slip Op 01157)

AEA Middle Mkt. Debt Funding LLC v Marblegate Asset Mgt., LLC

2023 NY Slip Op 01157

Decided on March 7, 2023

Appellate Division, First Department

RENWICK, J.P., 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: March 7, 2023
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Dianne T. Renwick
Barbara R. Kapnick Jeffrey K. Oing Peter H. Moulton John R. Higgitt

Index No. 650413/19 Appeal No. 16877 Case No. 2022-00293 

[*1]AEA Middle Market Debt Funding LLC, et al., Plaintiffs-Respondents-Appellants,
v
Marblegate Asset Management, LLC, et al., Defendants-Appellants-Respondents, New Teraco, Inc., et al., Defendants-Respondents.

Certain defendants appeal, and plaintiffs cross-appeal, from an order of the Supreme Court, New York County (Melissa A. Crane, J.), entered on or about December 7, 2021, which, to the extent appealed and cross-appealed from as limited by the briefs, denied defendants Marblegate Asset Management, LLC, Marblegate Special Opportunities Master Fund L.P., P. Marblegate Ltd., Marblegate Strategic Opportunities Master Fund I, L.P., Marblegate Partners Master Fund I, L.P., (the Marblegate defendants), Field Point Agency Services Inc. and Archway Marketing Services Inc., AWM Holdings, Inc., Archway Marketing Holdings, Inc., and Corporate Services, Inc., (the Archway defendants), motion for dismissal of claims asserted against them based upon alleged breach of covenant of good faith and fair dealing. The Archway defendants also appeal the denial of dismissal of the indemnification claims asserted against them. Plaintiffs cross-appeal from the dismissal of breach of contract claims asserted against the Marblegate defendants and Field Point, the breach of fiduciary duty claims asserted against Marblegate defendants and the derivative breach of fiduciary duty claim asserted against defendant John Brecker on behalf of Archway Marketing Services, Inc.

 
Herrick Feinstein LLP, New York (Sean E. O'Donnell, Janice I. Goldberg, Christopher Carty, Kyle J. Kolb and Silvia Stockman of counsel), for Marblegate Asset Management, LLC, Marblegate Special Opportunities Master Fund L.P., P. Marblegate Ltd., Marblegate Strategic Opportunities Master Fund I, L.P., Marblegate Partners Master Fund I, L.P., Field Point Agency Services, Inc. and New Teraco, Inc., appellants-respondents/respondent.
Goulston & Storrs PC, New York (Jaclyn H. Grodin and Isabel Sukholitsky of counsel), for AWM Holdings, Inc., Archway Marketing Holdings, Inc., Archway Marketing Services, Inc. and Corporate Services, Inc., appellants-respondents.
Harris St. Laurnent & Wechsler LLP, New York (Alisha Louise McCarthy and Yonaton Aronoff of counsel), and Yetter Coleman LLP, Houston, Texas (Tracy N. LeRoy of the bar of the State of Texas, admitted pro hac vice of counsel), for respondents-appellants.
Bracewell LLP, New York (Russell Gallaro and David Ball of counsel), for John Brecker, respondent.

RENWICK, J.P., 

This appeal addresses whether plaintiffs,[FN1] a group of minority lenders in a syndicated secured credit facility agreement,[FN2] may proceed on their claims [FN3] against a group of majority lenders and a collateral agent, among others. This intercreditor dispute stems from the collateral agent's action, at the direction of the majority lenders, to "credit bid"[FN4] the debt of all secured lenders at a nonjudicial foreclosure auction. Upon acquiring the debtor's assets, the majority lenders then sold the debtor's assets as a going concern to an entity owned by the majority lenders, thus transforming the sale of the collateral into a reorganization sale. Plaintiffs minority lenders essentially argue that after [*2]credit bidding at the auction for all secured creditors, the collateral agent's sale of the debtor's assets to an entity owned by the majority lenders, for consideration issued by the new corporation in the form of unsecured noncash debt, effectively compromised the minority lenders' security interests in the collateral. This, plaintiffs argue, violated their pro rata rights under the credit and security agreements.
Procedural and Factual Background
Plaintiffs' complaint and exhibits referenced herein establish the following: The debtor corporation in this action is defendant Archway Marketing Services Inc. (Archway),[FN5] a Delaware corporation with headquarters in Rogers, Minnesota. It provides marketing logistics, fulfillment, and supply chain management services. Plaintiffs and Marblegate defendants [FN6] are lenders to a $165 million credit facility agreement (Credit Agreement), with Archway defendants dated July 2, 2012. Plaintiffs loaned nearly $60 million of the loan amount. The Credit Agreement was used to finance AWM's acquisition of all capital stock of AMH and its subsidiaries. The Credit Agreement loans were secured by a lien on substantially all the Archway defendants' assets pursuant to a Guaranty and Security Agreement (Security Agreement). The Credit Agreement and Security Agreement were both executed on July 2, 2012.
Pertinent Sections of the Credit Agreement and Security Agreement
Section 1.10(c) of the Credit Agreement is a waterfall structure providing that, in the event of a default and sale of the collateral, the proceeds must first be used to pay all obligations on the First Out Revolving Loans [FN7] before any other distribution is made. Moreover, it requires pro rata distribution, in that "all proceeds of Collateral received by Agent or any Lender as a result of the exercise of remedies under any Collateral Document after the occurrence . . . of an Event of Default, shall be applied" in compliance with the waterfall structure, and, "In carrying out the foregoing, . . . (ii) each of the Lenders or other Persons entitled to payment shall receive an amount equal to its pro rata share of amounts available to be applied."
Section 9.1(a) of the Credit Agreement concerns amendments and waivers. It precludes the Agent or any other party from overriding a lender's rights without their consent, including their rights to Archway collateral and pro rata treatment.[FN8] Section 9.11(b) addresses the sharing of payments among lenders. Specifically, it provides:
"If any Lender . . . obtains any payment of any Obligation of any Credit Party . . . and such payment exceeds the amount such Lender would have been entitled to receive if all payments had gone to, and been distributed by, Agent in accordance with the provisions of the Loan Documents, such Lender shall purchase for cash from other Lenders such participations in their Obligations as necessary for such Lender to share such excess payment with such Lenders to ensure such payment is applied [*3]as though it had been received by Agent and applied in accordance with this Agreement"
Under § 11.1 of the Credit Agreement, "Required Lenders" are defined as any lender holding more than 50% of the sum of the aggregate revolving loan commitment plus the aggregate unpaid principal balance of the outstanding term loans. Several provisions of the Credit Agreement granted the Required Lenders the authority to dictate certain actions on behalf of all lenders.
The Credit Agreement designated the "Administrative Agent" (i.e., Agent) as the entity responsible for handling matters regarding the collateral. Under § 8.3(a), the Agent could act either under the loan agreements or pursuant to instruction by the Required Lenders. Under § 7.2(c) the Agent may exercise on behalf of itself and the lenders all rights and remedies available to it under the loan agreements. Upon an event of default, sections 7.5 and 8.3(c) vest upon the Agent the right to exercise remedies "on behalf of the Secured Parties" and "for the benefit of all the Lenders."[FN9]
Archway's Default and the Fifth Amendment to the Credit Agreement
The debtor, Archway defendants, began having cashflow problems and defaulted on loan payments from July 2018 to December 2018. In September 2018, in response to the ongoing default, the lenders (plaintiffs and the Marblegate defendants) executed a forbearance agreement and Fifth Amendment to the Credit Agreement. Under section 5 of the Fifth Amendment, the lenders agreed to appoint defendant Field Point Agency Services, Inc. as the agent, replacing nonparty Antares Capital LP.
The Fifth Amendment created a first-out revolving credit facility that increased the loan commitments of the Marblegate defendants and some of the plaintiffs, resulting in the Marblegate defendants claiming to hold approximately 51% of the Archway defendants' outstanding debt and plaintiffs holding the remaining 49%. (As of the date of the reorganization sale, $122 million had been lent to the Archway defendants). As a result, the Marblegate defendants claimed they had Required Lender status under the Credit Agreement. As Required Lenders, the Marblegate defendants were empowered to instruct Field Point, the agent.
Under the Fifth Amendment the lenders agreed to forbear on exercising their default-related rights and remedies during the forbearance period to "permit the Credit parties and the Lenders an opportunity to consummate a Restructuring." The Credit Agreement also established a tight time period to achieve various restructuring milestones, including (i) agreeing upon a term sheet by October 15, 2018, (ii) entering into a Restructuring Support Agreement by November 30, 2018, and (iii) consummating a restructuring by December 28, 2018. However, each of those deadlines was missed. Archway failed to pay the principal, interest, and fees due on August 21, September 21, October 1, October 22, November 23, and December 24, 2018, and failed to maintain the minimum levels of Actual [*4]Liquidity and maintain Senior Leverage Ratios and Fixed Charge Coverage Ratios as the Credit Agreement required.
The Restructuring Transaction
On December 26, 2018, Field Point circulated a memorandum announcing a restructuring transaction. The memorandum included a notice of the execution of a "Restructuring Support Agreement" between Archway defendants, Field Point and Marblegate defendants dated December 24, 2018. At the outset, the Restructuring Support Agreement distinguished an "Initial Consenting Lender" from other lenders. The Initial Consenting Lenders collectively owned in the aggregate more than 50% of the outstanding amounts due on the Credit Agreement. The Marblegate defendants comprised all the Initial Consenting Lenders. A lender executing a joinder agreement would become a party to the Restructuring Support Agreement as a "Consenting Lender," and, together with the Initial Consenting Lenders, would be referred to as "Consenting Lenders." Each Consenting Lender would be entitled to receive "on a pro rata basis, an aggregate principal amount of $5.0 million additional existing Term Loans (the 'Additional Loans')" as a "restructuring support agreement fee."
Field Point set Friday, January 4, 2019, as the deadline for each lender to execute a joinder agreement in order to receive its share of the consent fee. A "Restructuring Term Sheet" incorporated into the Restructuring Support Agreement explained the material terms and conditions of the transaction. First, the Consenting Lenders, in accordance with section 8.3(a) of the Credit Agreement, had directed Field Point to act, as provided under sections 7.5 and 8.3(a), and initiate foreclosure proceedings to sell 100% of AMH's stock (Foreclosed Assets) at a public auction under Uniform Commercial Code (UCC) § 9-610(a). Second, the Consenting Lenders had directed Field Point to submit a credit bid (Lender Credit Bid) at the foreclosure sale. The relevant section in the Term Sheet reads:
"The Consenting Lenders shall direct the Agent to, and the Agent shall, on behalf of the Lenders, credit bid all or a portion of the Obligations (consisting of outstanding principal amounts under the Last Out Revolving Loans and Term Loans (the 'Credit Bid Obligations')) for the Foreclosed Assets at the Foreclosure Sale (the 'Lender Credit Bid'), and such direction to the Agent shall acknowledge that the existing indemnity in the Credit Agreement shall apply to the entire Lender Credit Bid and Foreclosure (as defined below) process.
"In the event that the Lender Credit Bid is declared the winning bid at the Foreclosure Sale, a pro rata portion of the Credit Bid Obligations held by each Lender shall be extinguished, up to the outstanding aggregate amount of the Credit Bid Obligations.

"In the event that the Lender Credit Bid is declared the winning bid at the Foreclosure Sale, immediately after the Foreclosure Sale, a new limited liability company ('New Archway') shall (i) purchase the Agent's right to the Foreclosed Assets and (ii) arrange for and obtain financing in the form of the Foreclosure Financing (as defined below). The Consenting Lenders shall direct the Agent, on behalf of the Lenders, to assign the Foreclosed Assets to New Archway as consideration for the Foreclosure Financing, as described below.
"In the event that the Lender Credit Bid is declared the winning bid at the Foreclosure Sale, the governance of New Archway upon consummation of the Foreclosure will be as determined by the Consenting Lenders. . . .
"The 'Foreclosure Financing' shall mean, collectively, the New First Lien Credit Facility and the New Unsecured Credit Facility ... The 'Foreclosure' shall mean, taken together, the Foreclosure Sale and the Foreclosure Financing."
Thus, the Lender Credit Bid encompassed only those amounts due on the Last Out Revolving Loans and Term Loans, but not the First Out Revolving Loans. The Term Sheet explained how the existing loans extended to Archway would transfer into new loans extended to New Archway if the Lender Credit Bid was successful. Holders of "First Out Revolving Loan Claims" may elect to have their claims paid in full or rolled over into "New Priority First Lien Term Loans on a pro rata basis" up to $10 million. A "First Out Revolving Loan Claim" includes "all claims against the Credit Parties on account of the First Out Revolving Loans under the Credit Agreement." All other "Existing Credit Agreement Claims (other than the First Out Revolving Loan Claims) shall be exchanged into New Unsecured Term Loans on a pro rata basis . . . subject to the subsequent exchange of New Unsecured Term Loans held by Priority Electing Lenders into New First Lien Term Loans." The "Existing Credit Agreement Claims" encompassed "all principal amounts owed by the Credit Parties to the Lenders under the Credit Agreement (including, without limitation, the First Out Revolving Loans, Last Out Revolving Loans and Term Loans)."
As for New Archway's debt and equity capital structure, the Term Sheet described two new credit facilities. The "New First Lien Credit Facility" subsection provides that:
"New Archway will enter into a new first lien credit facility (the 'New First Lien Credit Facility') through which New Archway will issue (i) new first out first lien term loans (the 'New Priority First Lien Term Loans') in an original aggregate principal amount of up to $30.0 million and (ii) new first lien term loans (the 'New First Lien Term Loans') in an original aggregate principal amount of $15.0 million. All New Unsecured Lenders (as defined below) will be offered the opportunity to participate in the New First Lien Credit Facility as follows: (i) up to $10.0 million of the New Priority First Lien Term Loans shall be funded through the conversion of the First Out Revolving Loan Claims on a pro rata basis (calculated based on relative holdings of First Out Revolving Loan Claims),[*5](ii) $20.0 million of the New Priority First Lien Term Loans shall be funded by a new money investment (the 'New Money Priority First Lien Term Loans') offered on a pro rata basis (calculated based on relative holdings of Existing Credit Agreement Claims) (such New Unsecured Lenders who elect to fund, the 'Priority Electing Lenders') and (iii) the New First Lien Term Loans shall be funded by an exchange of each Priority Electing Lenders' New Unsecured Term Loans into the New First Lien Term Loans on a pro rata basis."
The assets of New Archway and its subsidiaries would be used to guarantee payment on the New Priority First Lien Term Loans and the New First Lien Term Loans. In addition, "[t]he New Priority First Lien Term Loans shall have waterfall priority and shall be paid in full in cash prior to the repayment of any other obligations of New Archway, including prior to the repayment of the New First Lien Term Loans." The "New Unsecured Credit Facility" subsection states that:
"New Archway will enter into a new unsecured credit facility (the 'New Unsecured Credit Facility') through which New Archway will issue new unsecured term loans (the 'New Unsecured Term Loans')  in an original aggregate principal amount of $15.0 million. Subject to the exchange as set forth in 'New First Lien Credit Facility' above, all current Lenders under the Credit Agreement shall receive New Unsecured Term Loans on a pro rata basis (calculated based on relative holdings of Existing Credit Agreement Claims) (such Lenders, the 'New Unsecured Lenders')."
On December 28, 2018, Field Point sent plaintiffs a notice of foreclosure, with the public sale to be held on January 28, 2019. Consistent with the Restructuring Support Agreement, the notice identified the "Auctioned Collateral" as "[a]ll right, title and interest of AWM Holdings, Inc. . . . in and to stock of Archway Marketing Holdings, Inc." The Foreclosed Assets would be sold in a single block to a single purchaser. The notice further provided that the assets "shall be sold for cash at such price and on such other commercially reasonable terms as the Agent (at the direction of the Required Lenders) may determine in its sole discretion" and that Field Point may submit a credit bid "against all or a portion of its secured claim and become the purchaser of the Auctioned Collateral."
On January 28, 2019, Field Point instituted foreclosure proceedings and put forth the Lender Credit Bid. On January 31, 2019, Field Point announced that the Restructuring Transaction had been consummated. According to a "Transaction Agreement," dated January 30, 2019, between Field Point, New Archway, New Teraco, Inc. (a company that is wholly owned by the majority lenders), AWM and Archway, the Lender Credit Bid was the winning bid for the Foreclosed Assets. The Transaction Agreement states that Field Point, on behalf of the lenders in the Credit Agreement, shall "sell, assign, transfer and deliver" and that New Archway [*6]"shall purchase, acquire and accept" all of Field Point's rights, title and interest in and to the foreclosed Assets at Field Point's direction. AWM will then transfer, assign, and deliver its right, title, and interest in the Foreclosed Assets by delivering executed stock powers directly to New Archway as consideration. New Archway agreed to incur debts comprised of "(i) $7,090,045 of New Subordinate Term Loans to each Lender that does not elect to participate in the New First Lien Credit Facility . . . and (ii) $45,000,000 of New First Lien Term Loans . . . provided by Lenders who elect to participate in the New First Lien Credit Facility."
Immediately after the transfer and assignment of the Foreclosed Assets to New Archway, Teraco and New Archway would complete the transactions described in the Term Sheet under a separate "Global Contribution Agreement." Archway's operating entities held approximately $45 million in assets before the foreclosure sale, and Teraco contributed assets worth approximately $4 million. Apart from $3.7 million paid to plaintiffs Midcap and Sun Life under the first out revolving facility, plaintiffs received "in exchange for their secured loans approximately 13% of face amount recovery in the form of unsecured, unguaranteed, subordinated replacement term loans from New Archway, and Marblegate, in turn, received . . . the entire equity of Archway."
The Second Amended Complaint and the Joint Motion to Dismiss
Plaintiffs commenced this action primarily against the majority lenders (Marblegate defendants), the collateral agent (Field Point), the original debtor (Archway defendants), and John Brecker, Archway's sole director. As relevant to this appeal, plaintiffs assert breach of contract claims against the majority lenders, collateral agent, and original debtor based upon alleged violations of the Credit Agreement and the Security Agreement. Plaintiffs assert breach of fiduciary claims against the majority lenders, the Collateral Agent, Original Debtor, and John Brecker (derivatively on behalf of Archway). Plaintiffs also assert a claim of breach of the covenant of good faith and fair dealing against all defendants. Finally, plaintiffs assert a claim for attorney fees against the Original Debtor based on the indemnification provision of the Credit Agreement.
All defendants moved to dismiss the second amended complaint pursuant to CPLR 3211 (a)(1) and (7) based on documentary evidence, including the relevant agreements. The motion court granted defendants' motion to the extent that it dismissed all of plaintiffs' claims except the implied covenant and indemnity claims. As for the fiduciary duty claim against the Majority Lenders, the court found that the Restructuring Transaction did not create a fiduciary duty between the lenders, and that plaintiffs were not entitled to a pro rata share of the Archway equity because the foreclosed assets were noncash assets. The court also found that Field Point never possessed [*7]the Archway Equity because it transferred its right to acquire the Archway Equity to New Archway. Further, the court found, as the controlling shareholder exercising its rights as third-party lender, the Marblegate defendants' actions were not subject to fiduciary review.
The court dismissed the breach of contract claim against Field Point, finding that it was barred by the exculpatory clause in § 8.3(a) of the Credit Agreement and that the Marblegate defendants had the right under § 7.2(c) to direct Field Point's actions. It also dismissed the breach of contract claim against the Marblegate defendants and Archway defendants, finding that the Restructuring Transaction was conducted in accordance with the Credit Agreement. The court also dismissed the derivative breach of fiduciary duty claim as to Brecker, finding that plaintiffs failed to sufficiently allege that he lacked independence or that his judgment was negligent.
The court denied defendants' motion to dismiss the implied covenant of good faith and fair dealing claim, finding that plaintiffs had adequately alleged that the Restructuring Transaction, the exchange of plaintiffs' $60 million in secured loans for $35 million in secured and unsecured loans, and the sale of the Archway Equity to Teraco, injured their rights to the fruits of the Credit Agreement. Finally, the court found plaintiffs adequately pleaded an indemnification claim against the Archway defendants based on § 9.6(a) of the Credit Agreement.
Both defendants and plaintiffs appeal. Defendants majority lenders (Marblegate defendants), the Collateral Agent (Field Point), and the Original Debtor (Archway defendants) appeal the denial of the dismissal of the claims asserted against them based on the alleged breach of the covenant of good faith and fair dealing. The Original Debtor also appeals the denial of the dismissal of the indemnification claims asserted against it. Conversely, plaintiffs appeal the dismissal of the breach of contract claims asserted against the majority lenders, the collateral agent and the original debtor, breach of fiduciary duty claims asserted against the Majority Lenders and the derivative breach of fiduciary claim asserted against defendant John Brecker.
Discussion
We first determine whether Supreme Court properly dismissed the various breach of contract claims asserted against the Majority Lenders, Collateral Agent, and the Original Debtor. These claims are controlled by the Intercreditor Credit and Security Agreements, which set out the relative rights and remedies of the secured creditors who extended financing to the Original Debtor. The governing principles are familiar. First, on a motion to dismiss pursuant to CPLR 3211, the court may grant dismissal when "'documentary evidence submitted conclusively establishes a defense to the asserted claims as a matter of law'" (Goldman v Metropolitan Life Ins. Co., 5 NY3d 561, 571 [2005], quoting Held v Kaufman, 91 NY2d 425, 430—431 [1998]).
Second[*8], Intercreditor Agreements are subject to the rules of contract interpretation, like any other agreements. Construction of an unambiguous contract is a matter of law, and the intention of the parties may be gathered from the four corners of the instrument and should be enforced according to its terms (see Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470, 475 [2004]; W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162 [1990]). The court should "construe the agreements so as to give full meaning and effect to the material provisions" (Excess Ins. Co. Ltd. v. Factory Mut. Ins. Co., 3 NY3d 577, 582 [2004]). A reading of the contract should not render any portion meaningless (see God's Battalion of Prayer Pentecostal Church, Inc. v Miele Assoc., LLP, 6 NY3d 371, 374 [2006]; Excess Ins. Co., 3 NY3d at 582). Further, a contract should be "read as a whole, and every part will be interpreted with reference to the whole; and if possible, it will be so interpreted as to give effect to its general purpose" (Matter of Westmoreland Coal Co. v Entech, Inc., 100 NY2d 352, 358 [2003] [internal quotations marks omitted]).
As a threshold consideration, the unambiguous terms of the agreement, for which the Minority Lenders bargained, show that the Collateral Agent had no discretion but to credit bid when directed to do so on behalf of all secured creditors (see Beal Sav. Bank v Sommer, 8 NY3d 318 [2007] [finding agent's ability under loan documents to bind a syndicate lender based on the direction of the majority lenders]). The secured lenders authorized the Collateral Agent to act on their behalf and the Majority Lenders could direct the Collateral Agent to credit bid or take other action to exercise remedies with respect to the collateral. Under § 8.3(a) of the Credit Agreement, the Agent could act either under the loan documents or pursuant to the instruction of the Required Lenders. Under § 7.2(c), the Agent may exercise on behalf of itself and the Lenders all rights and remedies available to it under the loan documents. Upon an event of default sections 7.5 and 8.3(c) vest upon the Agent the right to exercise remedies "on behalf of the Secured Parties" and "for the benefit of all the Lenders." Thus, upon the occurrence and during the continuance of an Event of Default, the Collateral Agent, at the request of the Required Lenders, exercises any rights and remedies provided to the Administrative Agent under the loan documents and the law, which included all remedies provided under the UCC (see e.g. In re Metaldyne Corp., 409 BR 671 [Bankr SD NY 2009] [interpreting provisions of loan documents as allowing agent to credit bid all of the outstanding obligations under the loan facility at the direction of majority lenders]).
Instead, plaintiffs minority lenders take issue with the integrity of the reorganization sale beginning with the credit bid becoming the winning bid at an auction, with no other bidder. As aforementioned, after Field Point foreclosed and won [*9]the credit bid for Archway, Field Point immediately sold Archway's equity to New Archway, a newly created entity, in exchange for new debt and financing obtained by New Archway. New Archway was then immediately sold to Teraco. The minority lenders argue that these transactions extinguished their secured creditors' claims by preventing them from receiving their ratable share of the collateral and instead siphoning the collateral to defendants' affiliate (Teraco) in an attempt to avoid complying with the sharing provisions of the Credit Agreement. For the reasons that follow, we find that these allegations are sufficient to plead claims of breach of contract against defendants Majority Lenders, Collateral Agent, and Original Debtor.
There are two "payment provisions" relevant to plaintiffs' breach of contract claim. Section 1.10(c) of the Credit Agreement provides that "all proceeds of Collateral received by Agent or any Lender as a result of the exercise of remedies under any Collateral Document after the occurrence and during the continuance of an Event of Default, shall be applied as follows: . . . each of the Lenders or other Persons entitled to payment shall receive an amount equal to its pro rata share of amounts available to be applied." Section 9.11(b) of the Credit Agreement is a "payment sharing" provision whereby the secured lenders have agreed to the process that should occur if some lenders in the syndication receive payment of a debt, by setoff, or otherwise, in excess of their ratable share. Specifically, § 9.11(b) provides that the lenders receiving the excess shares are required to "purchase for cash from other Lenders such participations in their Obligations as necessary for such Lender to share such excess payment with such Lenders to ensure such payment is applied as though it had been received by Agent and applied in accordance with this Agreement" (cf. In re Enron Corp., 2005 WL 356985 *7, 2005 US LEXIS 2134, *27-28 [SD NY, Feb. 15 2005, NO. CIV 1367 [NRB] [quoting provisions of syndicated lending agreement requiring lenders receiving more than its pro rata share to purchase participations in the debt]).
A plain reading of these "payment sharing" provisions in the Credit Agreement supports plaintiffs' position that all secured lenders agreed to pro rata treatment of their debtor's obligations, and that all lenders that received more than their pro rata share are required to distribute such excess to the other lenders. Moreover, contrary to the motion court's conclusions, it cannot be disputed that this "payment sharing" provision applied to the credit bid. Indeed, section 8.3(c) of the Credit Agreement provides that "the authority to enforce rights and remedies hereunder and under the other Loan Documents against the [Borrowers] shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, Agent in accordance with the Loan Documents [*10]for the benefit of all the Lenders." Thus, the end result of the credit bid would be that each secured lender has a pro rata interest in the debtor's assets, which requires pro rata treatment of their debt obligations.
Defendant majority lenders do not dispute that plaintiff minority lenders should have retained their pro rata rights after the credit bid. Instead, they argue that the minority lenders were accorded "pro rata treatment." Specifically, as Supreme Court held and defendants Majority Lenders argued, the restructuring transaction satisfied the pro rata requirements of the Credit Agreement because the new debt issued by New Archway to purchase the Archway Equity foreclosed upon by Field Point was available to all lenders. Like Supreme Court, defendants Majority Lenders misconstrue the interplay of the credit bidding transaction with the pro rata requirements of the Credit Agreement.
Essentially, a credit bid converts debt into equity through the exercise of legal remedies, such as the nonjudicial foreclosure sale that took place in this case pursuant to the UCC.[FN10] Here, there was a straightforward credit bid on behalf of all secured creditors where the only source of consideration involved was the credit bid itself.[FN11] In a technical sense, such a credit bid, on behalf of all secured lenders, is forcing each lender to make a credit bid that will be set off against the separate debt of each lender. Since the lenders are strictly bidding their debt and no other consideration is involved, there would be no proceeds of sales to distribute in the event the credit bid becomes the winning bid at the foreclosure sale auction. Thus, the only consideration that is involved is the credit bid trade off  all secured lenders are extinguishing their debt in exchange for the collateral. To the extent that the pro rata payment provisions of the Credit Agreement are deemed to apply to the credit bid, the end result is that having participated in the credit bidding, each majority and minority lender is entitled to a pro rata interest in the collateral (i.e., Archway) pursuant to the pro rata provisions of the Credit Agreement.
We perceive no basis under the Credit Agreement not to apply the pro rata payment provisions to the lender credit bid that encompassed the amounts due on the Last Out Revolving Loans and Term Loans, but not the First Out Revolving Loans.[FN12] Although the Credit and Security Agreements granted the Collateral Agent discretion to act on behalf of all secured lenders, its ability to exercise discretion was not unfettered. Rather, its discretion was limited to the extent specifically delegated to it in the governing loan documents. Specifically, section 9.1(a) of the Credit Agreement (see note 8, supra) states that Field Point as the Collateral Agent can act by direction of the Required Lenders, except in instances of amendment or waiver of any provisions of the Credit Agreement, in which case, prior written consent of each secured lender must [*11]be obtained, rather than just approval of the Required Lenders.[FN13] Defendants majority lenders and Collateral Agent can point to no language in the Credit or Security Agreement that grants them the right to fundamentally alter the right of the minority lenders by minimizing their pro rata rights or by permitting different treatment of their rights to the foreclosed collateral without their consent.
Accordingly, the pro rata sharing provisions required that all minority lenders receive pro rata treatment of their debt obligations, which meant that the proceeds of the sale of the collateral (notes and equity) should have been distributed to all secured lenders pro rata in accordance with the terms of the credit agreement. Contrary to Supreme Court's conclusion, waiving the right to a cash payment (and concomitantly agreeing to be "dragged along" with the majority lenders in a credit bid transaction) is not the same as waiving the fundamental right to pro rata treatment (net paydown of debt) of the foreclosed collateral. While the Collateral Agent, as directed by the majority lenders, was authorized to define the terms, conditions, and limitations of how the restructuring sale should be carried out, the reorganization had to be for the pro rata benefit of all those holders of secured debt, including minority lenders. Thus, the minority lenders have the right to object to the restructure sale conducted through credit bidding based upon the failure to provide them adequate protection of their pro rata interest on the foreclosed collateral.
The reasoning in Prudential Ins. Co. of America v WestLB AG (37 Misc 3d 1208[A] 2012 NY Slip Op 51935 [u] [Sup Ct, NY County 2012],[FN14] is consistent with our reasoning here that the pro rata requirements of the Credit Agreement survived the winning credit bid on behalf of all secured lenders and thus required that all secured lenders must receive the same pro rata treatment of their debt obligations during a reorganization sale. In Prudential Ins Co., the credit agreement for the loan at issue directed that any proceeds of the sale of collateral be distributed pro rata among the lenders. The agreement also required the unanimous consent of all lenders to modify the credit agreement. In the borrowers' bankruptcy case, the agent took an active role coordinating debtor-in-possession financing and an exit loan for the debtor/borrower, among other things. Some, but not all, of the lenders participated in these loans. The agent also, with the approval of a majority of lenders, credit bid at a bankruptcy auction. The bankruptcy court approved the credit bid and the sale free and clear of all liens.
After the auction, the agent drafted the operating agreement for the new entity that would take title to the assets purchased through the credit bid. All the members of the lending group were to be the owners of the new entity. However, the agreement did not treat all the members equally. Those lenders that had participated in funding [*12]the exit financing [FN15] (as opposed to those lenders that had not) received superior rights, including priority in distributions, superior voting rights and a liquidation preference that corresponded to their interests in the exit facility.
Some of the lenders that did not participate in the exit facility refused to sign the new operating agreement and instead sued the agent and the other lenders in the group for breach of contract, among other claims. The plaintiffs argued that because the credit agreements required a pro rata distribution of proceeds of the sale of collateral, the inferior treatment (both as to ownership and the liquidation preference) offered to them through the operating agreement was a breach of contract. The agent argued that the exit facility and the enhancements contained in the operating agreement were within its authority under the credit agreement. The agent also pointed to broad language authorizing it to take actions "necessary and desirable to protect or realize upon" the collateral (Prudential Ins. Co. of America, 2012 NY Slip 51935 [U], *5). The agent noted that it had acted with the consent of the majority of the lenders in the group.
The Prudential court rejected the agent's arguments. The court examined the credit agreement and concluded that it unequivocally mandated a pro rata distribution among the lenders. While the court did not focus on whether the agent's conduct modified a term of the credit documents, it did find that the lenders' right to pro rata distribution could not be modified without the unanimous consent of all of the lenders in the group. As for the other lenders in the group who were sued, the court found them liable for accepting the distribution of membership interests in the operating agreement in "complete disregard" of the plaintiffs' rights. Thus, like here, the dispositive issue in Prudential wasthat the Collateral Agent received the credit bid assets on behalf of the secured lenders but ignored the pro rata distribution required by the Credit Agreement and allowed disparate treatment of the credit bid assets.
Similarly, here, defendants majority lenders and Collateral Agent have not established, by documentary evidence or otherwise, that the restructuring transaction satisfied the requirements of pro rata treatment of all secured lenders. Instead, as fully explained in the complaint, it appears that the reorganization sale conducted through credit bidding resulted in a marked diminution of the minority lenders interests in comparison to what the majority lenders received. Defendants have not offered any justification under the Credit Agreement for the majority lenders to have received equity interest in the corporation that ultimately took control of the Archway collateral as a going concern (Teraco), while minority lenders have received only unsecured debt with the opportunity to elevate their debt to secured debt if they contributed new financing. By failing to share equity in the [*13]collateral, minority lenders were no longer able to share with majority lenders in any upside potential of the restructure sale of the former collateral as a going concern.
Even if minority lenders were not entitled to equity in Teraco, at the very least, they were entitled to the noncash consideration, in whatever form, that satisfied their pro rata share of the monetary value of the foreclosed collateral. On its face, the receipt of unsecured debt does not appear to comply with the pro rata requirement of receiving the same net paydown of debt as the majority lenders. The reorganization sale, conducted through credit bidding, was for the benefit to all secured lenders, but it did not result in the equal benefit of the minority secured lenders. Their interests were subordinated to other debt holders and to the stockholders of a corporation owned by the majority lenders. This is not what minority lenders bargained for in the Credit Agreement as secured lenders.
In further efforts to avoid contractual liability, defendant Collateral Agent seeks protection under the exculpatory clause of the Credit Agreement. New York law generally enforces contractual provisions absolving a party from its own negligence (see Sommer v Federal Signal Corp., 79 NY2d 540, 553 [1992]; Melodee Lane Lingerie Co. v American Dist. Tel. Co., 18 NY2d 57, 69 [1966]; Ciofalo v Vic Tanney Gyms, 10 NY2d 294, 297—298 [1961]). Public policy, however, forbids a party's attempt to escape liability, through a contractual clause, for damages occasioned by "grossly negligent conduct" (Sommer v Federal Signal Corp., 79 NY2d at 554). Used in this context, "gross negligence" is conduct that evinces a reckless disregard for the rights of others or "smack[s] of intentional wrongdoing" (id.).
Plaintiffs' allegations meet this standard. Specifically, plaintiffs allege that the Collateral Agent, acting at the direction of majority lenders (Marblegate) and in defiance of plaintiffs' written objections, willfully breached the Credit Agreement by, among other things, exceeding the scope of its authority as administrative agent by failing to enforce the rights and remedies under the Credit Agreement for the benefit of all lenders and failing to ensure that each of the lenders received its pro rata treatment pursuant to the Credit Agreement (see Morgan Stanley Mtge. Loan Trust 2006-13ARX v Morgan Stanley Mtge. Capital Holdings LLC, 143 AD3d 1, 8-9 [1st Dept 2016] [allegations that defendant ignored contractual obligations, disregarded known risks that loans were defective, and failed to do minimal due diligence sufficiently supported gross negligence claim]). Defendant Collateral Agent has failed to demonstrate as a matter of law that it is entitled to be exculpated for its actions. The issue of gross negligence ordinarily presents an issue of fact (see Sommer v Federal Signal Corp., 79 NY2d at 554-555).
Implied Covenant of Good Faith and Fair Dealing Against All Defendants
In addition to finding [*14]that plaintiffs' breach of contract claims should not have been dismissed, we also perceive no basis to dismiss plaintiffs' claim for breach of the implied covenant of good faith and fair dealing. All contracts contain an implied covenant of good faith and fair dealing (see Forman v Guardian Life Ins. Co. of Am., 76 AD3d 886, 888 [1st Dept 2010]). The covenant provides that no party to a contract shall take any actions to spoil the rights of another party to receive the fruits of the contract (id.). Where a cause of action for breach of the implied covenant of good faith and fair dealing is based on the same operative facts and seeks the same damages as a cause of action for breach of contract, the good faith claim is duplicative and should be dismissed (see Mill Fin., LLC v Gillett, 122 AD3d 98, 104-105 [1st Dept 2014]). A good faith claim, however, is not duplicative of a breach of contract claim where the complaint alleges conduct that is separate from the conduct constituting the alleged breach of contract and such conduct deprived the other party of the benefit of its bargain (see Credit Agricole Corporate v BDC Fin., LLC, 135 AD3d 561, 561 [1st Dept 2016]).
In this case, as to the claims for breach of the implied covenant of good faith, plaintiffs allege in the second amended complaint:
"In violation of this duty and acting in willful bad faith, Marblegate, Field Point, and the Archway Defendants secretly designed the Restructuring Transaction so as to defeat Plaintiffs' contractual expectations of pro rata treatment, concealed the transaction from Plaintiffs until it could be revealed as a fait accompli, withheld information from Plaintiffs necessary for them to effectively participate in the restructuring process, and improperly structured a commercially unreasonable foreclosure auction process designed to preclude effective participation by third parties, including Plaintiffs, thereby minimizing, not maximizing, returns from the foreclosure and undermining Plaintiffs' reasonable economic expectations under the Credit Agreement."
Contrary to defendants' allegations, plaintiffs' good faith and fair dealing claims are not wholly duplicative of their breach of contract claims and can legally support an independent cause of action. Defendants oversimplify the allegations in the complaint when they argue that plaintiffs' good faith and fair dealing claims are nothing more than a claim that defendants failed to share collateral ratably. Plaintiffs allege more than this. In essence, plaintiffs' good faith and fair dealing claims concern defendants' alleged bad faith conduct in conspiring to manufacture a restructuring process that deprived plaintiffs of the benefit of their bargain under the terms of the Credit Agreement. For instance, the credit bid by all secured lenders may have been an unduly high credit bid, for a collateral worth much less as a going concern and thus intended, as minority lenders allege, to trump any cash bid by third-party [*15]purchasers, which may have been more favorable to minority Lenders. Indeed, there were no other bids proffered at the non-judicial foreclosure sale.
Under the circumstances, the implied covenant of good faith and fair dealing claims did not arise from the same set of facts as the breach of contract claims (see Credit Agricole Corporate, 135 AD3d at 561 [in an intercreditor dispute, plaintiffs' causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing were not duplicative, based on allegations that defendants failed to share collateral ratably, and deliberately manipulated and depressed bids thereby depriving plaintiffs of the benefit of their bargain]; cf. Amcan Holdings, Inc. v Canadian Imperial Bank of Commerce, 70 AD3d 423, 426 [1st Dept 2010], lv denied 15 NY3d 704 [2010]). Nor do we find that plaintiffs' good faith and fair dealing claims are contradicted by the essential terms of the Credit Agreement. An implied covenant will not be enforced when it contradicts the provision of the contract (see e.g. Phoenix Capital Invs. L.L.C. v Ellington Mgt. Group, LLC, 51 AD3d 549, 550 [1st Dept 2008]; National Union Fire Ins. Co. of Pittsburg, Pa. v Xerox Corp., 25 AD3d 309, 310 [1st Dept 2006], lv dismissed 7 NY3d 886 [2006]). Here, however, plaintiffs are merely employing the implied covenant to enforce and seek redress for the violation of their reasonable expectations under the Credit Agreement. Additionally, plaintiffs' implied covenant claim as to Field Point is not barred by the Credit Agreement's exculpatory clause because the agreement does not expressly address the alleged conduct at issue (see Capone v Castelton Commodities Intl., LLC, 148 AD3d 506, 507 [1st Dept 2017]).
Breach of Fiduciary Duty Claim Against Majority Lenders and Archway Defendants
We reach a different result as to the breach of fiduciary duty claim asserted against the majority lenders. The court correctly dismissed the breach of fiduciary duty claim against the Marblegate and Archway defendants. Given that the Marblegate defendants' alleged fiduciary responsibility as a majority shareholder arose in the context of a contractual foreclosure process in which they were creditors, they did not owe a fiduciary duty to plaintiffs as purported minority shareholders (see Odyssey Partners, L.P. v Fleming Companies, Inc., 735 A2d 386, 414-415 [Del Ch 1999]). Because plaintiffs' fiduciary duty claim fails, their aiding and abetting claim against Field Point and Teraco also fails (see Gerber v EPE Holdings, LLC, 2013 Del Ch LEXIS 8, *45-46, 2013 WL 209658, *11 [Del Ch, Jan. 18, 2013, No. 3543-VCN]).
Derivative Fiduciary Duty Claim Against Defendant Brecker
The court should not have dismissed the derivative fiduciary duty claim against defendant Brecker, the sole director of Archway. Under Delaware law, a derivative suit by shareholders charging a corporation with various corporate misdeeds is not permitted unless the shareholders first [*16]make a (failed) demand on the board of directors to prosecute the claims (see McElrath v Kalanick, 224 A3d 982, 990 [Del 2020]). The failure to make such a demand may be excused, however, and a derivative suit allowed to continue, where the facts indicate that any demand by the shareholders would have been a futile gesture. A plaintiff may establish demand futility by showing that there is a reason to doubt either (a) the disinterestedness and independence of a majority of the board upon whom demand would be made, or (b) the possibility that the transaction could have been an exercise of business judgment (see Aronson v Lewis, 478 A2d 805, 814 [Del 1984], overruled on other grounds Brehm v Eisner, 746 A2d 244 [Del 2000]).
To satisfy the second prong of Aronson, implicated here, a derivative plaintiff must allege particular facts raising a reasonable doubt as to whether the questioned corporate act was a proper business judgment. Specifically, such a plaintiff must "plead particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision" (Matter of J.P. Morgan Chase & Co. Shareholder Litig., 906 A2d 808, 824 [Del Ch 2005], affd 906 A2d 766 [Del 2006]). The complaint "must allege not only that the directors were incorrect in their assessment at the time but that they either intended to harm shareholders, or at least were absolutely careless in the matter" (Matter of Tyson Foods, Inc. Consolidated Shareholder Litig., 919 A2d 563, 595 [Del Ch 2007]).
In this case, the complaint sufficiently pleads the second prong of Aronson, that the challenged transaction was not a proper exercise of business judgment. Contrary to the motion court's findings, plaintiffs' allegations go beyond simply alleging that Brecker was appointed by Marblegate and Field Point. Instead, plaintiffs assert that Brecker failed to hold a competitive process and failed to hire an investment banker (see Ryan v Gursahaney, 2015 Del Ch LEXIS 123, *29-31, 2015 WL 1915911, *8-9 [Del Ch, April 28, 2015, No. 9992-VCP], affd 128 A3d 991 [Del 2015] [business judgment rule can be rebutted if particularized facts raise reasonable doubt about the informational component of directors' decision-making process, measured by concepts of gross negligence, including consideration of all material reasonably available]). Accepting the alleged facts as true, and according plaintiffs the benefit of every possible favorable inference, which this Court must on a motion to dismiss (see Leon v Martinez, 84 NY2d 83, 87 [1994]), plaintiffs adequately raise a reasonable doubt regarding Brecker's decision-making process in agreeing to a Restructuring Transaction that appeared to be designed in secret and to disadvantage the minority lenders (cf. Matter of Synutra International, Inc. Stockholder Litigation., 2018 Del Ch LEXIS 266, *16-17, 2018 WL 705702, *6 [Del Ch, Feb. 2, 2018[*17], No. 2017-0032-JTL [no inference of gross negligence arose where committee held 15 meetings over 10 months, hired legal and financial advisors, contacted 13 strategic buyers, and negotiated higher price for stock in merger]).
Contractual Indemnification Claim Against Archway
We finally turn to the contractual indemnification claim against Archway defendants with regard to attorney's fees. Defendants' appeal from the denial of the dismissal of such claim has been rendered moot by plaintiffs' abandonment of the claim at Supreme Court, and it therefore must be dismissed.
Conclusion
Accordingly, the order of the Supreme Court, New York County (Melissa A. Crane, J.), entered on or about December 7, 2021, which, to the extent appealed from as limited by the briefs, granted defendants' joint motion to dismiss the first, second, sixth, seventh, eighth, ninth, and thirteenth causes of action and denied their motion to dismiss the tenth and fifteenth causes of action, should be modified, on the law, to deny the motion to dismiss the sixth, seventh, eighth and ninth causes of action for breach of contract, respectively against Field Point, Marblegate defendants and Archway defendants, and the thirteenth cause of action alleging a breach of fiduciary duty claim derivatively against defendant Brecker on behalf of Archway Marketing Services, Inc., and to grant Archway defendants' motion to dismiss the fifteenth cause of action against them for indemnification of attorneys' fees, and otherwise affirmed, without costs.
Order Supreme Court, New York County (Melissa A. Crane, J.), entered on or about December 7, 2021, modified, on the law, to deny the motion to dismiss the sixth, seventh, eighth and ninth causes of action for breach of contract, respectively against Field Point, Marblegate defendants and Archway defendants, and the thirteenth cause of action alleging a breach of fiduciary duty claim derivatively against defendant Brecker on behalf of Archway Marketing Services, Inc., and to grant Archway defendants' motion to dismiss the fifteenth cause of action against them for indemnification of attorneys' fees, and otherwise affirmed, without costs.
Opinion by Renwick, J.P. All concur.
Renwick, J.P., Kapnick, Oing, Moulton, Higgitt, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: March 7, 2023

Footnotes

Footnote 1: Plaintiffs are AEA Middle Market Debt Funding LLC, AEA Middle Market Debt II Funding LLC, Bancalliance Inc., Midcap Financial Trust, Midcap Funding XVIII Trust, and Sun Life Assurance Company of Canada, individually and derivatively on behalf of Archway Marketing Services, Inc.

Footnote 2: In a multi-lender syndicated credit facility agreement each lender individually has a debtor-creditor relationship with the borrower, contributes its pro rata share of loans, and becomes a party to a loan or credit agreement that provides, among other things, for the designation of an agent to act for the benefit of the lenders.

Footnote 3: Plaintiffs' claims include breach of contract, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, and indemnification.

Footnote 4: "Credit bidding is a mechanism, enshrined in the US bankruptcy legislation, whereby a secured creditor can 'bid' the amount of its secured debt, as consideration for the purchase of the assets over which it holds security. In effect, it allows the secured creditor to offset the secured debt as payment for the assets and to take ownership of those assets without necessarily having to pay any cash for the purchase" (Amy Jacks and Trevor Borthwick, Credit Biddings: A US import that will be a key part of a UK lender's toolkit in the current distressed market (available at: https://www.mayerbrown.com/en/perspectives-events/publications/2020/10/credit-bidding-a-us-import-that-will-be-a-key-part-of-a-uk-lenders-toolkit-in-the-current-distressed-market [Last accessed 3/6/2023]).
Footnote 5: The debtor defendants are Archway, AWM Holdings, Inc. (AWM), Archway Marketing Holdings, Inc. (AMH), and Corporate Services, Inc. (collectively the Archway defendants). The Archway defendants are affiliates of the parent company AMH.

Footnote 6: The Marblegate defendants are Marblegate Asset Management, LLC, Marblegate Special Opportunities Master Fund L.P., P. Marblegate Ltd., Marblegate Strategic Opportunities Master Fund I, L.P., Marblegate Partners Master Fund I, L.P.

Footnote 7: A First-Out Revolving Facility is one in which the first-out lender is paid before the other lenders in the context of a syndicated loan, instead of all lenders receiving proportionate payouts (see Marc P. Hanrahan and Jerome McCluskey, An Overview of 1st-Out Revolvers, available at: https://www.milbank.com/images/content/8/8/8837/ An-Overview-Of-1st-Out-Revolvers.pdf [last accessed 2/23/23]).

Footnote 8: Sections 9.1(a)(ii-iv) and (vii), Amendments and Waivers, states, in pertinent part:
"9.1 (a) [N]o amendment or waiver of, or supplement or other modification (which shall include any direction to the Agent pursuant) to, any Loan Document . . . and no consent with respect to any departure by any Credit Party from any Loan Document, shall be effective unless the same shall be in writing and signed by Agent, the Required Lenders (or by Agent with the consent of the Required Lenders), and the Borrower and then such waiver shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such waiver, amendment, supplement (including any additional Loan Document) or consent shall, unless in writing and signed by all the Lenders directly affected thereby (or by Agent with the consent of all the Lenders directly and adversely affected thereby), in addition to Agent, the Required Lenders (or by Agent with the consent of the Required Lenders) and the Borrower, do any of the following: . . .

"(ii) postpone or delay any date fixed for, or reduce or waive, any scheduled installment of principal or any payment of interest, fees or other amounts (other than principal) due to the Lenders . . . hereunder or under any other Loan Document . . . ;

"(iii) reduce the principal of, or the rate of interest specified herein ... or the amount of interest payable in cash specified herein on any Loan, or of any fees or other amounts payable hereunder or under any other Loan Document . . . ;

"(iv) (A) change or have the effect of changing the priority or pro rata treatment of any payments . . . Liens, proceeds of Collateral or reductions in Commitments . . . or (B) advance the date fixed for, or increase, any scheduled installment of principal due to any of the Lenders under any Loan Document; . . .

"(vii) discharge Borrower or all or substantially all of the Guarantors (as such term is defined in the Guaranty and Security Agreement) from their respective payment Obligations under the Loan Documents, or release all or substantially all of the Collateral, except as otherwise may be provided in this Agreement or the other Loan Documents."
Footnote 9: § 7.5 states: "Borrower, Agent and each Secured Party hereby agree that no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the guaranty of the Obligations or any provision of the Guaranty and Security Agreement, it being understood and agreed that all powers, rights and remedies hereunder and under the Collateral Documents may be exercised solely by Agent, on behalf of the Secured Parties in accordance with the terms hereof and thereof."§ 8.3(c) states, in pertinent part: "[T]he authority to enforce rights and remedies hereunder and under the other Loan Documents against the Credit Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, Agent in accordance with the Loan Documents for the benefit of all the Lenders and the L/C Issue"

Footnote 10: see generally Randall Klein, Danielle Juhle, Majority Rules: Non-Cash Bids And The Reorganization, 84 Am. Bankr. L.J. 297 [2010]; Keith A. Simon, Credit Bidding by a Syndicated Lending Group: Understanding the Complexities of § 363(k) of the Bankruptcy Code, 18. Norton J Bank L & Prac 6 Art 5 [2009]).

Footnote 11: This is in contrast to where the majority debtor credit bids proportionately its secured debt and pays cash consideration for the remainder of the secured debt.

Footnote 12: Because the lender credit bid did not encompass the First Out Revolving Loans, their liens on the collateral were not affected by the credit bid and were satisfied by pro rata cash payments to the holders of such claims.

Footnote 13: Defendants do not argue, nor is there any document indicating prior written consent.

Footnote 14: Although we are not required to follow lower court decisions, this case from the Commercial Division of the New York State Supreme Court, is persuasive and instructive.

Footnote 15: Exit financing, or an "exit facility," is the financing provided to debtors to allow them to emerge from bankruptcy (see Robin Phelan & Ocean Tama, The Use of DIP Financing As A Mechanism To Control The Corporate Restructuring Process, 44 TEX J. BUS. L. 15 [2011]).